IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

SHIRLEY BAKER,

      Plaintiff,

v.                        CASE NO. 2:04-cv-00115

JO ANNE BARNHART,
Commissioner of Social Security,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the court are cross-motions for judgment on the pleadings.

Plaintiff, Shirley Lynn Baker (hereinafter referred to as "Claimant"), filed an application for SSI on August 28, 2001, alleging disability as of July 1, 2001, due to a back impairment. (Tr. at 67-68, 71.)  The claim was denied initially and upon reconsideration.  (Tr. at 43-47, 49-50.)  On July 11, 2002, Claimant requested a hearing before an Administrative Law Judge

("ALJ").  (Tr. at 51-52.)  Hearings were held on January 10, 2003, and March 6, 2003, before the Honorable James D. Kemper, Jr.  (Tr. at 310-14, 315-49.)  By decision dated October 30, 2003, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 17-24.)  The ALJ's decision became the final decision of the Commissioner on January 3, 2004, when the Appeals Council denied Claimant's request for review.  (Tr. at 7-10.)  On February 12, 2004, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2003).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers

2

from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2003).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at

18.)  Under the second inquiry, the ALJ found that Claimant suffers
from the severe impairments of degenerative disc disease of the
lumbar spine and meniscal injuries to the left knee.  (Tr. at 19.)
At the third inquiry, the ALJ concluded that Claimant's impairments
do not meet or equal the level of severity of any listing in
Appendix 1.  (Tr. at 19.)  The ALJ then found that Claimant has a
residual functional capacity for light work, reduced by
nonexertional limitations.  (Tr. at 22.)  As a result, Claimant
cannot return to her past relevant work.  (Tr. at 22.)
Nevertheless, the ALJ concluded that Claimant could perform jobs
such as product packager, companion to the elderly, laundry worker,
product sorter and selector, product inspector, and machine tender,
which exist in significant numbers in the national economy.  (Tr.
at 23.)  On this basis, benefits were denied.  (Tr. at 23.)

Scope of Review

     The sole issue before this court is whether the final decision
of the Commissioner denying the claim is supported by substantial
evidence.   In Blalock v. Richardson, substantial evidence was
defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

4

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was forty-four years old at the time of the administrative hearing. (Tr. at 317.) Claimant graduated from high school. (Tr. at 318.) In the past, she worked as an egg packer, painting, sanding and loading refrigerators and as a cook and delivery person for a pizza restaurant. (Tr. at 318-21.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

Evidence before the ALJ

Lumbar spine x-rays on September 24, 2001, revealed degenerative disc changes at L5-S1. (Tr. at 133.)

The record includes treatment notes from Bruce Merkin, M.D. On August 20, 2001, Dr. Merkin noted that Claimant reported a

5

tender lump in her low back.  On straight leg raising, Claimant had pain at about 45 degrees.  She had much less tenderness raising the right leg.  He diagnosed chronic low back pain and recommended various diagnostic studies.  (Tr. at 136.)  In a separate note, he wrote that Claimant had severe low back pain with radiculopathy.  He stated that Claimant needed imaging studies and medication and that Claimant should be approved for the West Virginia Medicaid program.  (Tr. at 137.)  On August 27, 2001, Dr. Merkin noted that Claimant reported Vioxx helped her pain.  (Tr. at 135.)

On February 21, 2002, Ashok Mehta, M.D. examined Claimant at the request of the State disability determination service.  Claimant had tenderness at L4-L5 and associated paraspinal muscle spasm.  Dr. Mehta stated that

> [a]pparently, she has the symptomatic features of lumbar radiculopathy.  Clinically, she does have diminished power in both legs but no other ... neurological signs are present.  She was in quite a bit of pain and was uncomfortable in sitting and supine positions but was comfortable in a standing position.  The range of motion of the lumbar spine and the legs are limited as described.  She did not have any other neurological impairment except for the bilateral weakness of the legs which could be secondary to pain.  She currently does not use any ambulatory aid.  She was not able to stand on her toes and heel, and was not able to squat and rise.

(Tr. at 141.)

On February 24, 2002, Lisa C. Tate, M.A. examined Claimant at the request of the State disability determination service.  Claimant's mood was euthymic and her affect broad and reactive.  (Tr. at 146.)  Claimant's insight was fair.  Her immediate, recent

and remote memory were within normal limits. Concentration appeared to be adequate. Ms. Tate diagnosed an adjustment disorder with depressed mood on Axis I and deferred an Axis II diagnosis. Claimant's daily activities included watching television, doing dishes, walking around and taking a bath. She goes to the grocery store on a weekly basis. On a monthly basis, she attends appointments, visits her mother and plays cards with friends. (Tr. at 147.) Claimant was appropriate and related fairly well during the interview. Concentration appeared to be adequate. (Tr. at 148.) Claimant's concentration was normal. (Tr. at 148.)

A State agency medical source completed a Physical Residual Functional Capacity Assessment on March 12, 2002, and opined that Claimant was limited to medium work, reduced by an occasional ability to climb ladders, ropes, scaffolds, ramps and stairs and a need to avoid concentrated exposure to extreme cold and heat, fumes, odors, dusts, gases, poor ventilation and hazards. (Tr. at 149-56.)

A State agency medical source completed a Psychiatric Review Technique form on March 14, 2002, and opined that Claimant had no severe mental impairments. (Tr. at 157-70.)

The record includes treatment notes from Adel Dimassi, M.D. dated December 3, 2001, through April 22, 2002. On December 3, 2001, Claimant complained of low back pain after carrying cinder blocks. Claimant reported to the hospital and was prescribed

Lortab, which helped her condition for a few months.  Claimant was limping and unable to use her left lower extremity.  Claimant had no sensory deficits.  Dr. Dimassi ordered an MRI and prescribed Lortab.  (Tr. at 223.)  An MRI on December 14, 2001, revealed degenerative change at the L5-S1 interspace.  There was mild central and bilateral bulging annulus at L4-5 with minimal central and left lateral bulging annulus at L5-S1.  There was no evidence of herniated nucleus pulposis or significant spinal stenosis.  (Tr. at 217.)

On December 17, 2001, Claimant reported her back pain improved with medication.  (Tr. at 215.)  On February 4, 2002, Dr. Dimassi noted that the minimal MRI findings did not correlate to Claimant's complaints.  Dr. Dimassi referred Claimant to an orthopedic surgeon.  (Tr. at 212.)  On February 28, 2002, another physician declined to prescribe Claimant Lortab, and told her to consult with Dr. Lowe.  (Tr. at 210.)

On March 23, 2002, Dr. Dimassi noted that Claimant, who underwent left knee surgery on March 6, 2002, reported significant and constant left knee pain. He noted Claimant's orthopedic surgeon prescribed Motrin, but refused to prescribe Lortab. Claimant's left knee was "mildly swollen compared to the right one. There is mild subcutaneous tissue swelling in the lateral side of the left knee." (Tr. at 175.)  Dr. Dimassi prescribed Lortab and referred Claimant to a pain clinic.  (Tr. at 175.)  On April 11,

8

2002, Claimant requested more pain medication.  Claimant had recently begun physical therapy.  Dr. Dimassi noted that the pain clinic had nothing to offer Claimant.  (Tr. at 174.)  On April 22, 2002, Claimant complained of low back pain radiating to her lower left extremity and left knee pain.  Dr. Dimassi prescribed Lortab and ordered nerve conduction studies on Claimant's left lower extremity.  (Tr. at 172.)  On June 17, 2002, Dr. Dimassi noted that Claimant had no focal or sensory deficits.  Flexion in the back was only about 20 degrees.  Dr. Dimassi noted that nerve conduction studies of the lower extremity were normal and that a recent MRI showed only minimal findings.  He explained that he could no longer help Claimant and that he would refer her to a pain clinic.  (Tr. at 208.)

The record includes additional treatment notes from the same practice as Dr. Dimassi, but are authored by Shadi Badin, M.D.  Dr. Badin noted in September of 2002, that Claimant received injections from the pain clinic and was referred by them to psychiatry. Claimant had lower back pain with no radiation, numbness or weakness in her legs.  Dr. Badin declined narcotic pain medication and instructed Claimant to reduce the amount of Naprosyn she was taking.  (Tr. at 205.)  On December 11, 2002, Claimant continued to complain of back pain.  Dr. Badin noted that Claimant had been referred to a pain clinic, but could not get an appointment until 2003.  She then made an appointment with Dr. Lowe, but he was

injured, and the appointment was cancelled. (Tr. at 202.)
Straight leg raising was normal, and the neurological examination
was normal. (Tr. at 202-03.)

The record includes treatment notes from Robert W. Lowe, M.D.,
who performed Claimant's knee surgery. On February 5, 2002, Dr.
Lowe noted that Claimant complained of low back pain radiating to
the left lower extremity and a swollen left knee. Claimant had
limited range of motion. Sitting straight leg raising was
negative. Sensation was intact. The left thigh circumference was
smaller than the right, but the calf circumference was the same.
X-rays of the lower back showed that Claimant had narrowing of the
L5-S1. Dr. Lowe noted that Claimant may eventually have to undergo
an anterior interbody fusion. (Tr. at 189.) Claimant underwent a
partial lateral meniscectomy, and her wounds healed well. (Tr. at
183.)

On March 29, 2002, Dr. Lowe noted that Claimant needed to work
on strengthening her quads to address her catching patella. He
noted Claimant had not yet been to physical therapy. Claimant had
no effusion of the knee. (Tr. at 180.) On April 8, 2002, Claimant
reported she was making progress in physical therapy. Claimant had
no significant effusion, but stated that her knee swells. Claimant
wanted pain medication and was given a prescription of Darvocet.
(Tr. at 179.) On May 7, 2002, Claimant complained posteromedially
in the knee. Dr. Lowe stated that an MRI showed some changes in

the medial meniscus, but that "it looked so normal that in the situation as encountered we elected no[t] to interfere or enter the medial meniscus." (Tr. at 178.) There was no effusion of the knee, McMurray's test was negative and the knee was stable. Claimant had full flexion and extension. Dr. Lowe indicated he would see Claimant in the future as needed. (Tr. at 178.)

A State agency medical source completed a Physical Residual Functional Capacity Assessment on June 17, 2002, and opined that Claimant was limited to light work, reduced by an occasional need to climb, balance, stoop, kneel, crouch and crawl. (Tr. at 190-97.)

The record includes treatment notes from Prestera Medical Services. On January 15, 2003, Claimant presented with feelings of depression and anxiety and poor sleep and temper control. She was diagnosed with major depressive disorder and generalized anxiety disorder and her GAF was rated at 40. (Tr. at 234.) On January 30, 2003, psychologist W. Andrew Riffle, M.A. noted that Claimant was on home confinement and her sister's three children were driving her crazy. Claimant reported intense pain all the time due to degenerative disc disease. Claimant's mood ranged from mildly dysphoric to euthymic with a broad and appropriate affect. (Tr. at 230-31.) On February 24, 2002, Claimant reported to Mr. Riffle that things were about the same. Claimant's mood was dysphoric to euthymic at times, her affect was broad and appropriate to mood.

11

(Tr. at 226-27.)

On January 20, 2003, Gregory A. Elkins, M.D. completed a West Virginia Department of Health and Human Resources, General Physical (Adults) form.  Dr. Elkins noted that straight leg raising on the left in the seated position caused extreme back irritability at fifteen degrees.  (Tr. at 254.)   He diagnosed low back pain, depression and asthma.  He opined that Claimant could not perform full time work and that her prognosis for return to work was poor. (Tr. at 255.)

The record includes treatment notes from the Day Surgery Pain Management Center dated July 12, 2002, and August 8, 2002.  On July 12, 2002, J.K. Lilly, III, M.D. observed that Claimant presented with an "embellished and somewhat dramatic pain presentation." (Tr. at 260.)   Dr. Lilly also noted that there was a strong somatoform pain presentation.  Claimant underwent a lumbar epidural steroid injection.  (Tr. at 260.)   On August 8, 2002, Claimant reported that the injection provided almost no pain relief except for "a little" easing on the day after the injection.   (Tr. at 259.)   Straight leg raises on the right were negative, external rotation caused right sided hip pain.  A left sitting straight leg raise was positive at approximately 70 degrees with complaints of hip and leg pain.  Claimant's diagnosis remained low back syndrome, likely secondary to a discogenic etiology in the L5-S1 and the L4-5 region.  Dr. Lilly "discussed candidly with Ms. Baker that her

physical exam, the style and location and direction of her pain complaints are not entirely consistent, nor are they always explainable ....” (Tr. at 259.)  Dr. Lilly attempted to “gently connect the idea of psychological and emotional response to pain as being part of the overall perception.  I have not told her the pain is ‘all in her head’.  I have simply suggested that what she describes and her physical exam are not always consistent.” (Tr. at 259.)

Following the supplemental administrative hearing, Stuart Gitlow, M.D. reviewed the evidence of record and answered interrogatories about Claimant’s mental impairments.  In response to a question asking whether the medical evidence establishes any mental impairments during the period from July 1, 2001, Claimant’s alleged onset date, to the present, Dr. Gitlow wrote that the

> medical evidence indicates a gradually worsening course
> of depressed mood over the time period from late 2001 to
> the present.  This depression is not noted as being the
> primary cause of any functional deficits.  The depression
> is described as resulting from the chronic pain, which
> itself appears to have an objectively measurable source.
> While there is rare use of cocaine, there is no evidence
> that the cocaine use has led to the depressive symptoms.
> The claimant’s description of having low mood briefly
> each day is not consistent with a major depressive
> disorder.  Her symptoms appear to be a nonpathological
> reaction to stress.  That is, her depressive symptoms are
> consistent with what we would expect in someone with
> chronic pain and are not reflective of mental illness.
> Diagnosis appears to be Pain Disorder Associated with a
> General Medical Condition, which is not considered a
> mental disorder.  That being said, there is no doubt that
> antidepressant medication may be helpful with respect to
> her low mood and related symptoms, and that use of such
> medication has been associated in the literature with

13

some symptomatic relief for pain.

(Tr. at 263.)  He further opined that Claimant did not meet any of the "B" or "C" criteria of the listings, alone or in combination. (Tr. at 264.)  Dr. Gitlow completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on which he opined that Claimant had good to unlimited abilities in all areas.  (Tr. at 268-70.)

Mr. Riffle completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on May 15, 2003.  He opined that Claimant had a poor ability to work with or near others without being distracted by them, complete a normal workday or workweek, accept instructions and respond appropriately to criticism from supervisors.  (Tr. at 273-74.)   T h e   r e c o r d includes additional treatment notes and other evidence from Mr. Riffle and others dated March 20, 2003, April 15, 2003, April 29, 2003, May 13, 2003, May 16, 2003, May 27, 2003, June 10, 2003, and July 7, 2003.  (Tr. at 275-92.)  On April 15, 2003, Mr. Riffle noted that Claimant reported severe anxiety and moderate depressed mood with crying episodes, agitation, sleep disruption, loss of interest and irritability.  He noted mild dysfunction in most of Claimant's daily functioning and rated her GAF at 49.  (Tr. at 291.)  On April 29, 2003, Claimant stated that she had been about the same.  Claimant described abuse by her stepfather during her childhood.  Claimant presented with various somatic complaints and

the resultant impact on her functional abilities.  Claimant's mood ranged from mildly anxious and agitated to euthymic.  Her affect was broad and appropriate.  (Tr. at 289-90.)  On May 13, 2003, Mr. Riffle noted that Claimant reported things were about the same. Claimant's mood was mildly anxious and agitated, generally, to euthymic at times.   Her affect was mildly restricted but appropriate to mood.  (Tr. at 287.)  On May 16, 2003, a source other than Mr. Riffle diagnosed Claimant with major depressive disorder, moderate, single episode and generalized anxiety disorder on Axis I.  An Axis II diagnosis was deferred.  The source rated Claimant's GAF at 60.  (Tr. at 286.)  On May 27, 2003, Claimant reported to Mr. Riffle that things had been going pretty well. Claimant's mood was euthymic generally and had improved from past sessions.  (Tr. at 279.)  On June 10, 2003, Claimant complained of increased irritability since her last visit.   Claimant's mood ranged from euthymic generally to mildly anxious and agitated. (Tr. at 277.)  On July 7, 2003, Claimant reported to Mr. Riffle symptoms of severe hostility with a moderately depressed mood, crying episodes, anxiety, agitation and loss of energy.  Claimant had a GAF of 51 and mild to no dysfunction in daily functioning. (Tr. at 275.)

Claimant's counsel requested clarification regarding Dr. Gitlow's responses to the ALJ's interrogatories.  In particular, Claimant's counsel asked whether Dr. Gitlow believed Claimant has

a severe mental impairment.  Dr. Gitlow responded that he did not
believe Claimant has a severe mental impairment.  Dr. Gitlow
explained that

> [t]he claimant's psychiatric symptoms are limited to
> occasions of depression that are limited in frequency and
> intensity such that the claimant does not meet criteria
> for depressive illness.  The medical record indicates
> that the depressive symptoms are secondary to chronic
> pain and that the depressive symptoms themselves are not
> significant contributors to any functional deficit that
> may be present secondary to the pain or to the medical
> disorder causing the pain.  To be more specific, if the
> claimant hypothetically did not have any medical
> difficulties, including pain, and if the claimant had
> only the psychiatric symptoms noted in the chart, there
> would be no significant limitation of physical or mental
> ability to perform basic work activities.  The claimant
> therefore does not have a severe psychological
> impairment.

(Tr. at 293.)  When asked whether the psychological symptoms that
are supported by clinical evidence are connected to and as a result
of her problem with chronic pain, Dr. Gitlow stated that

> [t]he medical record indicates that this is indeed the
> case.  Psychological symptoms appear to be the direct
> result of the claimant's chronic pain as opposed to being
> the result of a primary mood disorder or her infrequent
> use of cocaine.  Naturally, it is impossible to be
> definitive about this without being able to observe the
> claimant in a pain-free state.  It is possible that the
> claimant has developed a mild depressive illness that
> would remain present even if her pain were to be
> resolved.  The symptom profile described in the chart
> combined with the variation in symptoms accompanying
> variation in pain-related symptoms, however, makes this
> rather unlikely.  It is possible that the claimant has
> been using cocaine to a greater extent than admitted
> within the medical record or observed by her treating
> clinicians; such use would undoubtedly lead to depression
> as noted in the record.  The available evidence gives no
> credibility to this explanation but neither does it
> refute it with toxicology screens.  It was therefore a

16

consideration in my original review of the record but as there was no evidence indicating that this explanation was likely, I discounted it as a probable explanation of the claimant's symptoms.

(Tr. at 293.)

Evidence Submitted to the Appeals Council

Claimant submitted to the Appeals Council, a treatment note from Dr. Badin dated March 24, 2003. Claimant had tenderness in the lower spine. The neurological examination was normal. Dr. Badin noted that there was no explanation for Claimant's lower back pain. (Tr. at 308-09.)

Claimant underwent a bone scan on May 8, 2003, which showed increased activity within the maxillary regions bilaterally, likely due to periodontal disease or maxillary sinus disease and displacement of the urinary bladder to the right. (Tr. at 306.)

On June 2, 2003, Dr. Badin noted the results of the bone scan. (Tr. at 305.)

On October 2, 2003, John Tiano, M.D. examined Claimant. Dr. Tiano diagnosed possible peptic ulcer disease secondary to chronic NSAID use, numbness and tingling in her upper extremities and stable chronic bronchitis. (Tr. at 299-300.) On November 13, 2003, Dr. Tiano noted Claimant's colonoscopy was negative, as was a GI workup. A nerve conduction study showed mild right carpal tunnel syndrome. Dr. Tiano did not recommend surgery. (Tr. at 296-97.)

17

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the Appeals Council failed to properly evaluate the evidence Claimant submitted or explain its findings; (2) the ALJ failed to adequately analyze the evidence of record, including that from Claimant's treating psychologist; and (3) the ALJ erred in his credibility findings. (Pl.'s Br. at 12-18.)

The Commissioner argues that (1) substantial evidence supports the ALJ's finding that Claimant could perform the light or sedentary jobs identified by the vocational expert; (2) the ALJ properly considered the opinion of Claimant's psychologist, Mr. Riffle; (3) the ALJ properly evaluated Claimant's credibility; and (4) remand is not warranted based upon the new evidence submitted to the Appeals Council.  (Def.'s Br. at 15-19.)

The court proposes that the presiding District Judge find that the decision of the Appeals Council that the new evidence offered by Claimant did not provide a basis for changing the ALJ's decision is supported by substantial evidence.  The Appeals Council specifically incorporated the new evidence cited above into the administrative record.  As a result, the court must review the record as a whole, including the new evidence, in order to determine if the Commissioner's decision is supported by substantial evidence. Wilkins v. Secretary, 953 F.2d 93, 96 (4th

Cir. 1991).  The new evidence from Drs. Badin and Tiano, as well as the negative results of the bone scan, provide no indication that the ALJ's decision would have been different had the ALJ reviewed the new evidence.  The new evidence offered by Claimant simply does not indicate that Claimant's conditions were more severe than found by the ALJ.  In fact, the bone scan results indicate the contrary.  Although Claimant was diagnosed with mild carpal tunnel syndrome, Dr. Tiano did not recommend surgery and there is no indication that this condition more than minimally affected Claimant during the time period prior to the ALJ's decision.

The court further proposes that the presiding District Judge find that the Appeals Council did not err in failing to explain its reasons for finding that the new evidence would not have changed the ALJ's decision.  As this court has indicated many times before, the Appeals Council is not obligated to provide a more in depth explanation about why the new evidence offered does not provide a basis for changing the ALJ's decision.  The court has reviewed and considered the published and unpublished decisions of the United States Court of Appeals for the Fourth Circuit and the opinions of the district courts within the Fourth Circuit on this issue, including a recent unpublished decision within the Southern District of West Virginia cited by Claimant.

The court continues in its position expressed in other decisions that the Appeals Council is not required to provide an in

depth explanation for its decision that additional evidence offered by a claimant does not warrant a change in the ALJ's decision and respectfully recommends such a finding to the presiding District Judge.   The court continues to find convincing, the unpublished decision of the Fourth Circuit in Hollar v. Commissioner of Social Sec. Admin., 194 F.3d 1304, 1304, 1999 WL 753999, at *1 (4th Cir. Sept. 23, 1999), cert. denied, 530 U.S. 1219, reh'g denied, 530 U.S. 1291 (2000) (citing Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992)); see also Freeman v. Halter, No. 00-2471, 2001 WL 847978 (4th Cir. July 27, 2001); cf. Hawker v. Barnhart, 235 F. Supp.2d 445, 448-53 (D. Md. 2002); Harmon v. Apfel, 103 F. Supp.2d 869, 872-74 (D.S.C. 2000); Riley v. Apfel, 88 F. Supp.2d 572, 580-81 (W.D. Va. 2000); Alexander v. Apfel, 14 F. Supp.2d 839, 843-44 (W.D. Va. 1998).   As the court in Hollar noted, the regulations addressing additional evidence do not direct the Appeals Council to announce detailed reasons for finding that the evidence does not warrant a change in the ALJ's decision.   20 C.F.R. § 404.970(b) (2003).

The court acknowledges the more recent unpublished decision by the Fourth Circuit in Thomas v. Commissioner of Social Security, No. 01-1544, 2001 WL 1602103 (4th Cir. Dec. 17, 2001), and finds that it does not direct a different result.   In Thomas, the claimant submitted new evidence to the Appeals Council, which indicated that it did not provide a basis for changing the ALJ's

decision.  Thomas, 2001 WL 1602103, at *2.  The district judge accepted the recommendation of a magistrate judge that the court affirm the Commissioner's denial of benefits.  The Fourth Circuit vacated the district court's decision and remanded the case to the Commissioner because on appeal, it became clear that the magistrate judge was not aware that the evidence submitted to the Appeals Council was from the claimant's treating physician.  In addition, the Fourth Circuit could not discern whether the Appeals Council also failed to correctly understand that the new evidence came from the claimant's treating physician.  Thomas was remanded not solely because of the lack of a more in depth explanation from the Appeals Council, but because of an ambiguity in the record that was not revealed until the case came before the Fourth Circuit.  Thomas, 2001 WL 1602103, at *3-4.

Nor does the court find any inconsistency between the court's position on the issue and the recent unpublished decision by the Honorable Robert C. Chambers.  In Dusty R. Toney v. Barnhart, No. 5:02-0489 (S. D. W. Va. Sept. 26, 2003), Judge Chambers sustained the claimant's objections to the magistrate judge's recommendation that the Commissioner's decision denying benefits be affirmed.  In Toney, the Appeals Council stated that new evidence was "considered" but "not material" to a determination of the claimant's disability status. Judge Chambers found that remand was necessary because of the failure of the Appeals Council to

adequately explain its reasons for rejecting the newly submitted evidence and for failing to include the new evidence as part of the transcript.  <u>Toney</u>, Sept. 26, 2003, slip op. at 4-5.  In a subsequent order entered December 13, 2003, denying the Commissioner's motion to alter or amend the court's judgment, Judge Chambers stated that "ambiguity of the Appeals Council's denial of review was the chief reason this Court remanded the case to the Commissioner for further proceedings." <u>Dusty R. Toney v. Barnhart</u>, No. 5:02-0489, slip op. at 8 (S. D. W. Va. Dec. 13, 2003).  In addition, Judge Chambers specifically stated that he did not "order, and does not require, the Appeals Council to provide a detailed analysis of evidence that it either does not consider ... or that it does consider but that either is immaterial or does not relate to the relevant time frame" such as was the case in the instant matter when the Appeals Council indicated that it determined the new evidence did not provide a basis for changing the ALJ's decision, i.e., that the new evidence was immaterial. <u>Toney</u>, Dec. 13, 2003, slip op. at 9.  Thus, as it has done many times before, the court proposes that the presiding District Judge find that the Appeals Council did not err in failing to provide a more in depth explanation as to why it determined the new evidence offered by Claimant did not provide a basis for changing the ALJ's decision.

Claimant next argues that the ALJ failed to adequately analyze

22

the evidence of record from Mr. Riffle and failed to provide an adequate explanation about the weight afforded his opinions. (Pl.'s Br. at 15-16.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. <u>See</u> 20 C.F.R. § 416.927(d)(2) (2003). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. § 416.927(d)(2) (2003). The opinion of a treating source must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 416.927(d)(2) (2003). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1994). If the ALJ determines that a treating source's opinion should not be afforded controlling weight, the ALJ must

then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 416.927(d)(2).

In his decision, the ALJ acknowledged that Claimant had received treatment for a major depressive disorder since January 2003. The ALJ noted the findings of Ms. Tate, the opinions of Dr. Gitlow, Mr. Riffle's findings in a July 7, 2003, treatment note, and the opinions of the state agency medical sources who opined that Claimant did not have a severe mental impairment. The ALJ determined that the evidence of record supports a finding of mild restriction in activities of daily living, mild difficulty in maintaining social functioning, mild difficulty maintaining concentration, persistence and pace and that she never experiences episodes of deterioration or decompensation. (Tr. at 19.) Thus, the ALJ determined Claimant did not suffer a severe mental impairment. Despite finding this condition to be nonsevere, the ALJ acknowledged Claimant's subjective complaints in this regard in his pain and credibility analysis (Tr. at 20) and found Claimant

not entirely credible, in part, because she "sought treatment for her complaints of depression and nervousness only two months prior to the hearing, despite having a medical card to pay for treatment." (Tr. at 21.)

With respect to Mr. Riffle's opinion on the Medical Source Statement of Ability to do Work-Related Activities (Mental) completed on May 15, 2003, the ALJ explained that he afforded little weight to this opinion because it is inconsistent with the treatment notes, particularly those from July 7, 2003. (Tr. at 19.)

The court proposes that the presiding District Judge find that the ALJ properly weighed the opinion of Mr. Riffle, and his findings in this regard are supported by substantial evidence. Substantial evidence of record, including the opinions of the State agency sources, Dr. Gitlow and Ms. Tate, all support a finding that Claimant does not suffer a severe mental impairment. In comparison, Mr. Riffle finds on his Assessment that Claimant has a poor ability to work with or near others without being distracted by them, complete a normal work day or work week and accept instructions and respond appropriately to criticism from supervisors. (Tr. at 273-74.)

In addition to being inconsistent with the remaining substantial evidence of record, Mr. Riffle's opinions on the Assessment are not consistent with his own treatment notes. The

25

treatment notes from April of 2003, through July of 2003, generally indicate an improvement in Claimant's GAF from 49 to 51.[1]  (Tr. at 275-91.)   On April 15, 2003, Mr. Riffle noted that Claimant reported severe anxiety and moderate depressed mood with crying episodes, agitation, sleep disruption, loss of interest and irritability.  He noted mild dysfunction in most of Claimant's daily functioning and rated her GAF at 49.  (Tr. at 291.)  On April 29, 2003, Claimant stated that she had been about the same. Claimant's mood ranged from mildly anxious and agitated to euthymic.  Her affect was broad and appropriate.  (Tr. at 289-90.) On May 13, 2003, Mr. Riffle noted that Claimant reported things were about the same.   Claimant's mood was mildly anxious and agitated, generally, to euthymic at times.  Her affect was mildly restricted but appropriate to mood.   (Tr. at 287.)   On May 16, 2003, a source other than Mr. Riffle diagnosed Claimant with major depressive disorder, moderate, single episode and generalized anxiety disorder on Axis I.   An Axis II diagnosis was deferred. The source estimated Claimant's GAF at 60.  (Tr. at 286.)  On May 27, 2003, Claimant reported to Mr. Riffle that things had been going pretty well.  Claimant's mood was euthymic generally and had improved from past sessions.  (Tr. at 279.)  On June 10, 2003, Claimant complained of increased irritability since her last visit.

---

[1]  The court notes that by May of 2003, a source at Prestera other than Mr. Riffle rated Claimant's GAF at 60.  (Tr. at 286.)

Claimant's mood ranged from euthymic generally to mildly anxious and agitated. (Tr. at 277.) On July 7, 2003, Claimant reported to Mr. Riffle symptoms of severe hostility with a moderately depressed mood, crying episodes, anxiety, agitation and loss of energy. Claimant had a GAF of 51 and mild to no dysfunction in daily functioning. (Tr. at 275.)

Mr. Riffle's opinion about the functional effect of Claimant's mental impairments stands alone in the record. While evidence from this treating source might ordinarily be entitled to more weight, its lack of consistency with Mr. Riffle's own treatment notes and the remaining substantial evidence of record justifies the ALJ's decision to discount this evidence, and the court proposes that the presiding District Judge so find.

Finally, Claimant argues that the ALJ did not consider all the factors identified in SSR 96-7p, including the duration and frequency of her pain and the type of medication Claimant takes and any side effects. In addition, Claimant argues that the ALJ incorrectly stated there is no mention of treatment for back pain after November of 2002, when Claimant complained to Dr. Elkins about back pain and reported it during a psychiatric evaluation. Claimant also asserts that the ALJ's decision to draw a negative inference from the fact that she only sought treatment for depression two months prior to the hearing ignores the fact that Dr. Lilly noted a possible somatoform pain presentation, and that

Claimant was placed on an antidepressent prior to receiving psychiatric treatment. (Pl.'s Br. at 17-18.)

The court proposes that the presiding District Judge find that the ALJ's pain and credibility findings are consistent with the applicable regulations, case law and social security ruling ("SSR") and are supported by substantial evidence. 20 C.F.R. § 416.929(b) (2003); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). Although the ALJ does not specifically discuss the duration and frequency of Claimant's pain, the ALJ's decision is otherwise very thorough in its consideration of Claimant's subjective complaints of pain. The ALJ acknowledged Claimant's testimony that she has

> low back pain that radiates into her left leg to her toes and up her body to her head. This pain began four or five years before she sought treatment in July 2001. Bending causes back pain. She stated she has left knee pain that has worsened since she had surgery. She has bronchitis and is short of breath and she has high blood pressure that makes her hands swell at times. She is nervous and depressed and has problems with her memory, getting along with people, and with her ability to concentrate and understand. The claimant testified she takes medication for her nerves, which helps. She takes medication for pain, but this does not help. She uses inhalers for bronchitis. She has been told to use a cane, which she does use to get out of bed. She has had steroid injections in her back, but these did not help. Ms. Baker stated she is able to lift a gallon of milk, stand for fifteen minutes, walk short distances, and sit for fifteen to twenty minutes. She cannot bend. She works jigsaw puzzles. Her mother cooks and does the housework. She has difficulty sleeping at night.

(Tr. at 20.) Contrary to Claimant's assertions, the ALJ adequately considered Claimant's medications and their side effects.

Furthermore, at the administrative hearing, this issue was fleshed out at length.  (Tr. at 325-26, 332-33, 341.)

The ALJ determined that Claimant's subjective complaints are not entirely credible because (1) Claimant sought treatment for her complaints of depression and nervousness only two months prior to the administrative hearing, despite having a medical card to pay for treatment; (2) Claimant testified that she has not seen a doctor about her knee pain since undergoing surgery and there is no evidence of treatment for Claimant's back pain after November of 2002; (3) treatment records show Claimant's complaints of pain have been found nonanatomical and have not been consistent with examination findings; (4) Claimant testified she is able to sit no more than twenty minutes at a time, but had no difficulty sitting throughout an entire forty minute hearing; and (5) treatment records show that Claimant's bronchitis is stable and asymptomatic and there is no evidence of treatment for hypertension.  (Tr. at 21.)

Claimant disagrees with many of the ALJ's credibility findings, but her arguments are unpersuasive.  Claimant asserts that the ALJ erred in finding that she did not seek treatment for her back after November of 2002, when in fact, she was examined by Dr. Elkins in January of 2003.  (Pl.'s Br. at 17.)  Dr. Elkins examined Claimant for purposes of determining whether she qualified for State benefits, and it does not appear from the record that his

involvement with Claimant was anything more than a one-time examination for purposes of determining continued eligibility for State benefits.  That Claimant reported to Dr. Badin in December of 2002, that she had an appointment with Dr. Lowe that was cancelled after he sustained an injury does not disprove the fact that there is little to no evidence of additional treatment for Claimant's back condition after 2002, at least as the record existed before the ALJ.  While evidence submitted to the Appeals Council indicates that Dr. Badin and Dr. Tiano examined Claimant in 2003, evidence from these sources also reveals that there continued to be no explanation for Claimant's back pain and that a bone scan was negative.  (Tr. at 306, 308-09.)

It appears to the court that the ALJ did draw a negative inference from the fact that Claimant first sought psychiatric treatment two months prior to the hearing.  This conclusion is reasonable and supported by substantial evidence.  Although other physicians allude to a possible psychological overlay, substantial evidence supports the ALJ's determination that this condition was not severe.

Based on the above, the court proposes that the presiding District Judge find that the ALJ's pain and credibility findings are supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge DENY the Plaintiff's

Motion for Judgment on the Pleadings, GRANT the Defendant's Motion for Judgment on the Pleadings, AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Joseph R. Goodwin. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and

31

Recommendation and to mail a copy of the same to counsel of record.


  April 4, 2005
       Date




                              Mary E. Stanley
                              Mary E. Stanley
                              United States Magistrate Judge